599 So.2d 791 (1992)
Eva MILEY, Individually and on Behalf of Her Deceased Son, Bruce L. Miley
v.
LOUISIANA FARM BUREAU CASUALTY INSURANCE COMPANY and George B. McKenzie.
CONSOLIDATED WITH
Murphy Keith WHEAT, Individually, and on Behalf of His Deceased Wife, Cindee Parker Wheat
v.
George B. McKENZIE, Individually, and as Administrator of the Estate of His Minor Son, Thomas B. McKenzie, Louisiana Farm Bureau Casualty Insurance Company, State Farm Mutual Automobile Insurance Company, and Estate of Robert R. Fussell.
Nos. 90 CA 0698, 90 CA 0699.
Court of Appeal of Louisiana, First Circuit.
February 21, 1992.
Rehearing Denied May 28, 1992.
*792 John M. Robin, Covington, for plaintiff-second-appellant Eva Miley.
Dale Branch, Bogalusa, for plaintiff-third-appellant Murphy K. Wheat.
John N. Gallaspy, Bogalusa, for defendants-first-appellants La. Farm Bureau and George B. McKenzie.
*793 Before WATKINS, CARTER, LANIER, LeBLANC and FOIL, JJ.
CARTER, Judge.
These consolidated appeals arise out of trial court judgments in suits for damages resulting from an automobile accident in which four people were killed.

FACTS
On July 12, 1986, at approximately 9:40 p.m., Cindee Parker Wheat and Bruce L. Miley were guest passengers in an automobile owned and operated by Robert R. Fussell, an uninsured motorist. The Fussell vehicle was proceeding south on Seven Mile Road. At about the same time, fifteen-year-old Thomas B. (Ben) McKenzie was driving a vehicle owned by his father, George B. McKenzie, west on Louisiana Highway 10 toward the intersection with Seven Mile Road. The McKenzie vehicle was also occupied by a guest passenger, Jason Seal. As the Fussell vehicle attempted to turn left onto Louisiana Highway 10, it was struck by the McKenzie vehicle. As a result of this accident, the occupants of the Fussell vehicle, namely Cindee Parker Wheat, Bruce L. Miley, and Robert R. Fussell, were killed.[1] In the McKenzie vehicle, Ben McKenzie suffered a serious cut on his lip, and Jason Seal, the fifteen-year-old guest passenger, was killed.
On November 17, 1986, Eva Miley filed suit for damages for the death of her son, Bruce L. Miley, against George B. McKenzie and his insurer, Louisiana Farm Bureau Casualty Insurance Company (Farm Bureau). Farm Bureau answered, alleging the negligence of Miley in riding with a driver whom he knew or should have known was intoxicated, and filed a third-party demand against the estate of Robert R. Fussell and against his parents, personally, for having accepted his succession.[2] Miley subsequently amended her petition, naming as additional defendants, James and Nadine Rogers, alleging that their minor son, Lance Rogers, had negligently provided liquor to Ben McKenzie.[3] Miley also requested exemplary damages under LSA-C.C. art. 2315.4 for the alleged intoxication of Ben McKenzie.[4]
On November 17, 1986, John H. Fussell and Elta Mae Fussell, individually and on behalf of their deceased son Robert R. Fussell, filed suit for damages against George B. McKenzie and Farm Bureau.
On December 12, 1986, Murphy Keith Wheat, husband of Cindee Parker Wheat, filed suit for damages and for the wrongful death of his wife. Named as defendants in Wheat's petition were: George B. McKenzie, individually and as administrator of the estate of his minor son Ben McKenzie; the Estate of Robert R. Fussell; Farm Bureau, McKenzie's liability insurer; and Allstate Insurance Company (Allstate), Wheat's uninsured motorist insurer.[5] Thereafter, Wheat amended his petition to name as additional defendants James and Nadine Rogers,[6] who filed a third-party demand against the estate of Robert R. Fussell.
*794 On January 20, 1987, Jean E. and Charles R. Parker, Cindee Parker Wheat's parents, filed suit for damages and for the wrongful death of their daughter against numerous defendants. Pursuant to a peremptory exception pleading the objection of no right of action, the Parkers' action was dismissed by judgment dated February 24, 1988.
Pursuant to motions to consolidate, these matters were consolidated for trial. After a jury trial, the jury determined that both Ben McKenzie and Robert Fussell were negligent. However, the jury found that, while Fussell's negligence was a cause-in-fact of the damages sustained by Wheat, Miley, and Fussell, McKenzie's negligence was not a cause-in-fact. Moreover, the jury determined that Wheat and Miley were contributorily negligent, which negligence was a cause-in-fact of their respective damages. In allocating fault in the Wheat case, the jury allocated fault as follows:

McKenzie 10%
Fussell 85%
Wheat 5%

In allocating fault in the Miley case, the jury allocated fault in the same proportions. Thereafter, the jury awarded damages to Wheat for only his wife's medical expenses. With the exception of this single item of damage, the jury made no monetary awards to any party for any damages.[7] *795
*796 Wheat, Miley, and Fussell filed motions for judgment notwithstanding the verdict and, alternatively, for new trials on the grounds that the jury verdict was contrary to the law and the evidence. Thereafter, the trial judge granted plaintiffs' motions and determined that the jury's verdict was inconsistent with regard to its finding that Ben McKenzie's fault was not a cause-in-fact of plaintiffs' damages and its allocation of 10% of the fault to him. However, the trial judge refused to reapportion fault between the parties. The trial judge then awarded plaintiffs damages. Eva Miley was awarded $35,000.00 for the loss of the love and affection of her son, Bruce L. Miley, as well as funeral and burial expenses of $5,038.53. Awards of $20,000.00 and $25,000.00, respectively, were awarded to Elta and John Fussell for the loss of the love and affection of their son, Robert R. Fussell, as well as funeral and burial expenses of $4,410.03. Murphy Keith Wheat was awarded $5,000.00 for the loss of the love and affection of his wife, Cindee Parker Wheat, $35,000.00 for the conscious pain and suffering of Cindee Wheat prior to her death, and $7,150.00 for medical expenses.
By judgment, dated June 14, 1989, the trial court rendered judgment in favor of Miley and against McKenzie and Farm Bureau for $38,036.58, together with legal interest from date of judicial demand plus costs. On June 21, 1989, the trial court signed the judgment in favor of the Fussells and against McKenzie and Farm Bureau for $4,944.10, together with legal interest from judicial demand and costs.[8] On June 26, 1989, the trial court rendered judgment in favor of Wheat and against McKenzie and Farm Bureau for $44,792.50, together with legal interest from date of judicial demand and all costs. The trial court also rendered judgment in favor of Allstate and against Wheat, dismissing the demands of Wheat against his uninsured motorist insurer with prejudice.
From these adverse judgments, McKenzie and Farm Bureau appeal, assigning the following errors:
1. The trial court erred in granting a Judgment N.O.V. in each of the two cases on appeal, setting aside the jury's *797 determination that the negligence of Ben McKenzie was not a cause in fact of the accident.
2. Alternatively, the trial court erred in disturbing the jury's assessment of damages in favor of Murphy Keith Wheat.
a. The jury did not abuse its much discretion in finding that Wheat did not sustain compensable damages for loss of love and affection as a result of his wife's death.
b. The jury did not abuse its much discretion in finding that Wheat did not prove that his wife suffered conscious pain and suffering prior to her death.
c. Even if the jury was in substantial error, the trial court erred in setting damages at a figure in excess of the discretionary range.
3. Alternatively, under the authority of Theriot v. Bergeron, 552 So.2d 1 (La. App. 1 Cir.1989), Farm Bureau and McKenzie should only have been cast for 10% of the damages, representing the allocation of negligence to McKenzie.
Wheat appeals the judgment of the trial court, assigning the following errors:
1. The trial court erred in failing to hold that the Allstate policy's UM coverage was available to Mr. Wheat.
2. The trial court erred in failing to award sufficient general damages to Mr. Wheat for the death of his wife.
Miley also appeals the trial court judgment, assigning the following errors:
1. The trial court erred in awarding Eva Miley only $38,036.58 in general damages for the death of her son.
2. Alternatively, if this court determines that the Judgment N.O.V. was improperly granted, the trial court erred in not granting a new trial.

UM COVERAGE BY ALLSTATE
Wheat contends that the trial judge erred in failing to find that his uninsured motorist insurance covered his deceased spouse. Wheat reasons that, under the clear terms of the policy, Cindee Parker Wheat was a resident of his household and that, as such, was an insured within the contemplation of the policy of insurance issued to him.
In Part V of the Allstate policy, under the section entitled "Uninsured Motorists Insurance, Coverage SS," insured persons are described as follows:
(1) You and any resident relative.
(2) Any person while in, on, getting into or out of an insured auto with your permission.
(3) Any other person who is legally entitled to recover because of bodily injury to you, a resident relative, or an occupant of your insured auto with your permission.
The policy defines resident as "the physical presence in your household with the intention to continue living there." You is defined in the policy as "the policyholder named on the declarations page and that policyholder's resident spouse."
The plain language of the Allstate policy sets forth two prerequisites for the extension of coverage to Cindee Parker Wheat. First, Cindee Parker Wheat had to be the spouse of Murphy Keith Wheat, who was the policyholder named on the declarations page. Second, Cindee Parker Wheat had to be a resident of the household of Murphy Keith Wheat, namely, she had to be physically present in his home with the intention to continue living there.
It is undisputed that, although Wheat and his wife, Cindee Parker Wheat, were undergoing a difficult time in their marriage and had consulted an attorney regarding the institution of divorce proceedings, at all times pertinent hereto, the parties were married to each other and had not instituted proceedings for separation from bed and board or for divorce. Therefore, the issue of coverage under the Allstate policy turns on whether Cindee Parker Wheat was a resident of her husband's household.
The controlling test of whether persons are residents of the same household at a particular time, within the meaning of the policy in question, is not solely whether they are then residing together under one roof. The real test is whether the absence *798 of the party of interest from the household of the alleged insured is intended to be permanent or only temporaryi.e., whether there is physical absence coupled with the intent not to return. Bearden v. Rucker, 437 So.2d 1116, 1121 (La.1983).
Whether a person is or is not a resident of a household is a question of law as well as a question of fact that is to be determined from the facts of each case. The question is largely one of intention. The intention of a person to be a resident of a particular place is determined by his expressions at times not suspicious, and his testimony, when called on, considered in light of his conduct and circumstances of life. Andrade v. Shiers, 516 So.2d 1192, 1194 (La.App. 2nd Cir.1987). Moreover, whether a living arrangement renders persons "residents of the same household" is not solely dependent upon whether they are living under the same roof. The emphasis is on whether the person can be found to have "membership in a group rather than an attachment to a building." Residency is, in this respect, "a matter of intention and choice" rather than a matter of location. Bearden v. Rucker, 437 So.2d at 1121; Andrade v. Shiers, 516 So.2d at 1194.
The term "household" embraces a collection of persons as a single group living together under one roof. It is a "collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness." Brown v. Trahan, 526 So.2d 1216, 1219 (La.App. 3rd Cir.1988).
Cindee Parker Wheat and Murphy Keith Wheat lived together for approximately three years prior to their marriage on July 12, 1985. On or about November 14, 1985, the couple purchased a home in Franklinton, Louisiana. Wheat testified that, in March of 1986, Cindee left their home in Franklinton and moved to her mother's home in Bogalusa to attend vocational school and to help her mother with her two younger siblings. Wheat acknowledged that he and Cindee were also experiencing some difficulties over their lifestyle; he thought they should settle down and raise a family, which included his child by a previous marriage, and Cindee, who was twenty-four years old at the time of her death, still wanted to enjoy life freely without those adult responsibilities.
Wheat testified that, when Cindee left, she left him a note and a set of keys, which contained her only key to their home. She took most of her clothing with her when she left, but various personal items, like her dirty laundry and her stereo, remained in the home.
Wheat testified that between March of 1986 and the date of her death in July of 1986, Cindee returned to their home on weekends and lived there one week to care for his minor child. However, Wheat acknowledged that, each time Cindee returned, she had to make arrangements with him to be able to enter the home because she had not retained a key to the house when she left. During her absence, Cindee often called Wheat at his mother's home. Wheat testified that he assisted his wife financially during the period of separation, including helping her pay for schooling.
Wheat acknowledged that, after his wife moved into her mother's home, she began seeing Robert Fussell socially. In fact, he and Fussell engaged in several fistic encounters over Cindee. Wheat had not seen his wife for four to six weeks prior to her death.
Various members of the Parker family also testified at trial. Cindee's mother, Jean Parker, testified that her daughter returned home in January of 1986, bringing with her most of her clothing. Mrs. Parker testified that her two younger children were fourteen and seventeen, respectively, at the time Cindee left Wheat and that she did not need Cindee's assistance with them. Mrs. Parker acknowledged that Cindee attended vocational school while residing in her home. Cindee's sister, Beth, reiterated her mother's testimony that Cindee returned to their home in January, 1986 and that Cindee and Fussell saw each other *799 socially for a couple of months prior to Cindee's death. Cindee's brother, Tracy, testified that his sister returned to their home in February, 1986 and that she lived there continuously until the date of her death. Tracy testified that his sister began seeing Fussell socially around April of 1986 and that Fussell and Cindee were together at their home two to three times a week. Tracy also testified that he often dropped his sister off at the Fussell home.
When we consider the particular facts of the instant case in light of the aforementioned principles, we conclude that, at the time of the accident, Cindee Parker Wheat was not a resident of the household of her husband, Murphy Keith Wheat. Cindee Parker Wheat had not been a member of the Wheat household for a continuous period of four to six months. She had few, if any, personal belongings at the Wheat house, had no key to the house, and was not free to come and go from there as she pleased. She was certainly not a member of a group living together under one roof. Nor can it be said that Cindee and her husband subsisted in common and directed their attention to a common object, the promotion of their mutual interests and social happiness. Most importantly, it was the obvious intention and choice of Cindee Parker Wheat not to return to the home of her husband. Cindee Parker Wheat chose to begin a new life and reside in the home of her mother where she could pursue the lifestyle she wanted. Therefore, we find that the trial court did not err in finding that Cindee Parker Wheat was not an insured under the policy of insurance issued by Allstate.

JNOV
Farm Bureau and McKenzie contend that the trial court erred in granting Wheat's and Miley's motions for judgment notwithstanding the verdict (JNOV). Farm Bureau and McKenzie reason that the trial judge erred in setting aside the jury's determination that, although McKenzie was at fault, his fault was not a cause-in-fact of the accident with regard to both the Wheat and the Miley cases. With regard to the quantum award, Farm Bureau and McKenzie contend that the trial judge erred in disturbing the jury's assessment of damages in favor of Wheat.[9]
LSA-C.C.P. article 1811 is the statutory authority for a motion for JNOV. This article does not, however, provide the standard to be applied by the trial judge in determining the propriety of such a motion, but the jurisprudential criterion is well-settled. Cupstid v. Harrison Hardwood Mfg. Co., 552 So.2d 1223, 1225 (La.App. 3rd Cir. 1989), writ denied, 558 So.2d 572 (La.1990); Jinks v. Wright, 520 So.2d 792, 794 (La. App. 3rd Cir.1987); Arnone v. Illinois Central Gulf Railroad, 461 So.2d 325, 327 (La.App. 1st Cir.1984). A JNOV may be granted only when the evidence, viewed in the light most favorable to the party opposing the motion, points so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict on the facts at issue. Cupstid v. Harrison Hardwood Mfg. Co., 552 So.2d at 1225; Jinks v. Wright, 520 So.2d at 794; Stafford v. Unsell, 492 So.2d 94, 97 (La.App. 1st Cir.1986). Further, the trial court may not weigh the evidence, pass on the credibility of the witnesses, or substitute its reasonable inferences from the facts for those of the jury. Cupstid v. Harrison Hardwood Mfg. Co., 552 So.2d at 1225; Jinks v. Wright, 520 So.2d at 794.
Recently, in Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991), the Louisiana Supreme Court set forth the standard of review for an appellate court as follows:
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria *800 just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

A. NEGLIGENCE OF McKENZIE AS CAUSE-IN-FACT.
Farm Bureau and McKenzie contend that the trial judge erred in granting the JNOV and setting aside the jury's verdict with regard to the liability of McKenzie.
After the testimony had been completed, the case was submitted to the jury by way of interrogatories. After their initial deliberation, with regard to the general verdict, the jury determined that:
(1) Ben McKenzie was not negligent;
(2) Robert Fussell was negligent, and his negligence was a cause-in-fact of the injuries to Cindee Parker Wheat and Bruce L. Miley; and
(3) Wheat and Miley were both contributorily negligent, and their negligence was a cause-in-fact of their own injuries.
However, in apportioning 100% of the fault among the parties in the special verdicts, the jury allocated 10% to McKenzie, 90% to Fussell, and 0% to Wheat and Miley.
After the jury returned this verdict, the trial judge determined that there was an inconsistency between the general verdict and the special verdicts. The jury was given instruction as to the inconsistency, and the matter was resubmitted to the jury. When the jury returned, with regard to the general verdict, the jury determined that:
(1) Ben McKenzie was negligent, but failed to answer whether his negligence was a cause-in-fact of the accident and injuries sustained by Cindee Parker Wheat and Bruce L. Miley;
(2) Robert Fussell was negligent, and his negligence was a cause-in-fact of the injuries to Cindee Parker Wheat and Bruce L. Miley; and
(3) Wheat and Miley were both contributorily negligent, and their negligence was a cause-in-fact of their own injuries.
In apportioning 100% of the fault among the parties in the special verdicts, the jury again allocated 10% to McKenzie, 90% to Fussell, and 0% to Wheat and Miley.
After the jury returned this second verdict, the trial judge again determined that there was an inconsistency between the general verdict and the special verdicts.[10] The jury was given instruction as to the inconsistency, and the matter was resubmitted to the jury. When the jury returned, with regard to the general verdict, the jury determined that:
(1) Ben McKenzie was negligent, but his negligence was not a cause-in-fact of the accident and injuries sustained by Cindee Parker Wheat and Bruce L. Miley;
(2) Robert Fussell was negligent, and his negligence was a cause-in-fact of the injuries to Cindee Parker Wheat and Bruce L. Miley; and
(3) Wheat and Miley were both contributorily negligent, and their negligence was a cause-in-fact of their own injuries.
In apportioning 100% of the fault among the parties in the special verdicts, the jury allocated 10% to McKenzie, 85% to Fussell, and 5% to Wheat and Miley, respectively.
After the jury returned this third verdict, the trial judge determined that there was no inconsistency and asked that the jury verdict be entered.[11] Thereafter, Wheat, Miley, and Fussell filed motions for a JNOV and, alternatively, for a new trial on the grounds that the verdict was contrary to the law and the evidence. After argument, *801 the trial judge granted the motions for JNOV and determined that the jury apparently did not understand the concept of cause-in-fact. The judge reasoned, that although the jury did not consistently answer the interrogatory addressing whether McKenzie's negligence was a cause-in-fact of the damages sustained in the accident, the jury consistently allocated 10% of the fault to McKenzie on all three occasions.
On review, we find that the facts and inferences point so strongly and overwhelmingly in favor of the moving parties that reasonable men could not arrive at a contrary verdict and that the trial judge was correct in granting the motion. The jury, after almost six days of testimony, continually attributed 10% of the fault to McKenzie, but failed to find that his conduct was a cause-in-fact of the accident. See Parliman v. Kennelly, 520 So.2d 445, 446-47 (La.App. 5th Cir.1988).
With regard to the liability of McKenzie, the evidence at trial consisted of the testimony of the only eyewitness, Ben McKenzie, the Adamses who testified that the McKenzie vehicle passed their vehicle shortly before the accident, the police officers who investigated the accident, the experts who performed the blood alcohol test on McKenzie, and the accident reconstruction experts.
McKenzie, who was fifteen years old and had been driving for approximately nine months at the time of the accident, testified that he and his friend, Jason Seal, drove into Franklinton for a short period of time and then drove into Bogalusa, where they met several friends, including Lance Rogers. McKenzie denied purchasing or drinking any beer or wine, other than the few sips of wine he obtained from Rogers while in Bogalusa, and denied having any alcoholic beverages in his vehicle at the time of the accident. McKenzie and Seal then departed Bogalusa to return home on Louisiana Highway 10 at approximately 55 mph. The posted speed limit at the time of the accident was only 45 mph because of road construction, which, except for the removal of the reduced speed limit signs, had been completed. As McKenzie approached Seven Mile Road, he observed the Fussell vehicle. McKenzie testified that he swerved to miss the Fussell vehicle, but struck the Fussell vehicle.
Sandra and Kenneth Adams testified they were travelling west on Louisiana Highway 10 toward the intersection with Seven Mile Road at the time the accident occurred. The Adamses testified that the McKenzie vehicle passed their vehicle shortly before they reached Seven Mile Road. They were travelling at approximately 60 mph and estimated McKenzie's speed at about 90 mph. Mr. Adams was the first person on the accident scene, and he assisted the police. While the McKenzie vehicle was being lifted from the Seal boy's body, Adams observed an eight-pack carton of beer fall from the vehicle. Adams testified that there were two unopened beers remaining in the carton; empty beer containers were also observed. Brian Adams, who lived in the area, testified that he witnessed an eight-pack of beer fall from the McKenzie vehicle when the wrecker lifted it from the Seal boy's body.
Lieutenant Barney McLain with the Louisiana State Police investigated the accident and observed some kind of alcoholic beverage container fall from the McKenzie vehicle. The officer testified that, although Seven Mile Road was controlled by a stop sign, the evidence revealed that the Fussell vehicle had cleared the lane of travel in which McKenzie was proceeding when the accident occurred. According to McLain, the accident occurred near the center line of Louisiana Highway 10. Tests performed on samples of McKenzie's blood taken some four hours after the accident revealed a blood-alcohol content of .01.
Dr. Monroe Samuels, an expert in the fields of toxicology and forensic pathology, testified that the four-hour delay between the time of the accident and the time the blood samples were taken from McKenzie would mean that McKenzie's blood alcohol level at the time of the accident was higher than the test results revealed because the body would metabolize the alcohol during the interim. Based on normal metabolism, Dr. Samuels estimated that McKenzie's *802 blood-alcohol level at the time of the accident was approximately .06 to .07. Dr. Samuels testified that it would take more than a few sips of wine to register a blood-alcohol level of .01 four hours later. According to Dr. Samuels, one would have to consume 3-½ to 4 drinks to reach a blood-alcohol level of .06 to .07. Dr. Samuels also testified that a young, naive drinker would be impaired in the operation of a motor vehicle at that blood-alcohol level.
Duaine T. Evans, traffic engineer and accident reconstructionist, testified that the McKenzie vehicle was travelling at approximately 50 to 55 mph at the time of impact and that, because of the presence of yaw marks at the scene, McKenzie had attempted to avoid the collision.
Based on this testimony, we conclude that finding McKenzie 10% at fault in causing this accident is proper on the facts of this case. The evidence of McKenzie's excessive speed and alcohol consumption, which impaired his driving ability, points so strongly and overwhelmingly in favor of Wheat, Miley, and Fussell that reasonable men could not have arrived at a contrary verdict and the trial court was correct in granting the JNOV on the issue of liability.

B. INCREASE IN AWARDS TO WHEAT.
Farm Bureau and McKenzie contend that the trial judge erred in granting Wheat's motion for JNOV with regard to quantum. Farm Bureau and McKenzie contend that the jury was correct in denying Wheat any damages for the loss of the love and affection of his wife and for her conscious pain and suffering in that Wheat failed to prove he was entitled to these damages. Alternatively, Farm Bureau and McKenzie contend that the record does not support an award of $35,000.00 for Cindee Parker Wheat's conscious pain and suffering.
In Anderson v. New Orleans Public Service, Inc., 583 So.2d at 833-834, the Louisiana Supreme Court also discussed the standard of review for a trial court's granting of a JNOV on the issue of quantum. The court stated:
Once a trial court has concluded that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusively high or abusively low, it must then determine what is the proper amount of damages to be awarded. In making this determination, the judge is not constrained as the courts of appeal are to raising (or lowering) the award to the lowest (or highest) point which is reasonably within the discretion afforded that court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976)....
The trial judge is in a better position to make a damage assessment than is an appellate court. The trial judge hears the testimony, views the evidence, and is able to evaluate the credibility of the witnesses. Once the jury verdict is set aside under the strict JNOV standards, the trial court is then the trier of fact. It should not be limited by the same constraints placed upon an appellate court reviewing a damage award. The trial judge should make an independent assessment of the damages and award a proper amount of compensation under the facts of the particular case.
The appellate court, in determining whether the trial court erred in granting the JNOV as to quantum, once again uses the criteria set forth in Scott, supra [v. Hospital Service District No. 1, 496 So.2d 270 (La.1986)], i.e., could reasonable men in the exercise of impartial judgment differ as to the fact that the jury award was either abusively high or abusively low. If the answer is in the affirmative, then the trial court erred in granting the JNOV, and the jury's damage award should be reinstated. On the other hand, if the answer is in the negative, then the trial court properly granted the JNOV, and its damage award based on its independent assessment of the damages is the judgment of the trial court which is reviewed on appeal under the constraints of Coco, supra.

Although the jury determined that the negligence of McKenzie and Fussell had caused the accident and injuries to Cindee Parker Wheat, the jury awarded Murphy *803 Keith Wheat only $7,150.00 for his wife's medical expenses. They did not award him damages for the loss of love and affection, nor did they award damages for the conscious pain and suffering of Cindee Parker Wheat. The trial judge, in granting the JNOV with regard to the issue of damages sustained by Murphy Keith Wheat, apparently determined that the evidence supporting Wheat's damages pointed so strongly and overwhelmingly in his favor that reasonable persons could not have arrived at a contrary verdict and awarded Wheat damages for loss of love and affection and for Cindee Parker Wheat's conscious pain and suffering. We will discuss each of these items of damages separately.

1. Loss of love and affection.

Murphy Keith Wheat testified that he and Cindee lived together for three years prior to their marriage. They were married on July 12, 1985, the year before she died. Wheat testified that he and Cindee partied and went out often before and during their marriage and that during that time they were very happy. Sometime during the year of marriage, Wheat obtained physical custody of his child by a previous marriage, and, as a direct result, their lifestyle changed. They stopped going out all of the time and began going to church. In March of 1986, Cindee became disenchanted with the prospect of assuming new responsibilities and left the Wheat home. Wheat testified that he loved Cindee very much and that he did everything in his power to keep their marriage together. Wheat testified that he literally "fought for her," and he lost. Wheat testified that after Cindee moved out of their home, she returned to spend several weekends with him. Wheat sought counseling through his church to help him deal with his marital problems, and Cindee attended church with him once after she left.
Wheat's mother, Betty Wheat, testified that Cindee and her son were very happy together at the time they got married. She testified that, after Cindee left in March, Cindee returned frequently and had even spent a week with Wheat. Since March of 1986, Cindee often called Betty Wheat's home looking for Wheat. Betty described her son's reaction to the news of his wife's death, noting that he "jumped like he was shocked and he couldn't believe it.... He wanted to take off to New Orleans, but the preacher ... held him back and said there wasn't anything he could do down there, and because, you know, they was going to send her body back to Bogalusa." Betty testified that her son loved Cindee very much.
Wheat's sister, Mary Elizabeth Wallace, testified that Wheat and Cindee had a very nice relationship"they had a lot of fun, did a lot of things together" and exhibited much affection for each other. Even after Cindee left Wheat in March, Wheat would often call Cindee at her mother's home, and Cindee also called the Wallace home to speak with Wheat.
Reverend Donnie Boutwell, pastor of Wheat's church, testified that he counseled Wheat about his marital relationship with Cindee on several occasions. According to Rev. Boutwell, Wheat exhibited affection and concern for his wife. Wheat wanted to resolve the differences with his wife and have a successful marriage, and he loved his wife very much up until the time she died. On the day Wheat learned of Cindee's death, Wheat was in Rev. Boutwell's office, and Rev. Boutwell testified that Wheat wept and was visibly upset by the news.
The record clearly supports an award for the loss of the love and affection suffered by Wheat as a result of the death of his wife. Reasonable men in the exercise of impartial judgment could not differ as to the fact that the jury's failure to assess any damages for loss of love and affection was abusive and the trial judge properly granted the JNOV.
However, in reviewing the trial judge's independent assessment of damages, we find that, under the constraints of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), the trial judge abused his discretion in awarding Wheat only $5,000.00 for damages for the wrongful death of Cindee Parker Wheat. We find *804 that the record supports the close relationship Wheat and his wife had prior to their physical separation shortly before Cindee's death. It is clear from the record that Wheat continued to have strong and deep affection for his wife and made numerous efforts to resume the marital relationship. Wheat cared a great deal for his wife even though those feelings may not have been reciprocated by Cindee Parker Wheat. Therefore, we raise the trial judge's award of $5,000.00 to $25,000.00, the lowest point which is reasonably within the discretion afforded the trial court.

2. Conscious Pain and Suffering.

Kenneth Adams arrived at the scene of the accident shortly after it occurred. Adams testified that, when he approached the Fussell vehicle, he heard Cindee Parker Wheat mumble and groan, which led him to believe that she was still alive and in pain. Adams noted that she was having difficulty breathing and that she asked him to help her. Adams testified that she was pinned in the Fussell vehicle until the fire department arrived to extricate her from the vehicle and that she requested his help almost one hour after the accident.
Trooper John Adams testified that when he arrived on the scene, Cindee Parker Wheat was still in the Fussell vehicle. Her condition was serious at that time, and the medical personnel were attempting to stabilize her condition. Trooper Adams was unable to speak with her.
Dr. J. Fraser McKenzie, the pathologist who performed the autopsy on Cindee Parker Wheat, testified by deposition. His testimony revealed that Cindee died at the hospital at approximately 5:00 a.m. on the morning following the accident, some seven hours after the accident. Dr. McKenzie attributed Cindee's death to exsanguination or bleeding to death. He noted that she had traumatic injuries, including hemorrhage to the brain and lacerations of her vena cava and her spleen. During the efforts to save her life, Cindee received eight to ten units of whole blood and other fluids to prevent shock and to keep the vascular system expanded.
After reviewing the entire record, we find that reasonable men could not differ as to the fact that the jury's failure to award any damages for Cindee Parker Wheat's conscious pain and suffering was abusive and that the trial court properly granted the JNOV. The record clearly supports his finding that Cindee Parker Wheat was not killed instantly and that she sustained conscious pain and suffering prior to her death. His award of $35,000.00 for such pain and suffering was not an abuse of discretion.

QUANTUM AS TO MILEY
Miley contends that the trial judge erred in awarding quantum. Miley reasons that the award of $35,000.00 for the loss of her son is insufficient and should be raised by this court on appeal. We agree.
In the instant case, the record reveals that Bruce L. Miley was the youngest of Eva Miley's five sons, who ranged in ages from forty-seven to twenty-five. Bruce's father was deceased. Although Bruce was twenty-five years old at the time of his death, he still resided with his mother. She and Bruce lived alone in their home on Seven Mile Road. Mrs. Miley testified that Bruce helped her around the house, mowing the yard, working the garden, and cleaning the house. When Bruce was employed, he often used his paycheck to assist his mother with household expenses, including groceries and things for the house, or he would give her money to spend on herself. Mrs. Miley does not drive, and Bruce would pick up items that she needed in town or drive her to town. Mrs. Miley testified that she depended on Bruce and that, since his death, she has no one. Mrs. Miley testified that she missed her son.
We find that the record supports the close relationship Mrs. Miley and her son Bruce had prior to his death. Although Bruce was a major at the time of his death, he had never left his mother's home, and he assisted his mother with household tasks and provided her with transportation. Therefore, we raise the trial judge's award *805 to $100,000.00, the lowest point which is reasonably within the discretion afforded the trial court. See Lemire v. New Orleans Public Service Inc., 538 So.2d 1151 (La.App. 4th Cir.), writs denied, 542 So.2d 1383 and 543 So.2d 2 (La.1989); Moreau v. State, Department of Transportation and Development, 527 So.2d 1221 (La.App. 3rd Cir.1988); Douget v. Allen Parish Police Jury, 520 So.2d 813 (La.App. 3rd Cir.1987).

SOLIDARY LIABILITY OF FARM BUREAU AND MCKENZIE
Farm Bureau and McKenzie alternatively contend that the trial court erred in rendering judgment against them for the entire amount of the damages rather than for the proportion of fault assessed against McKenzie. Farm Bureau and McKenzie reason that, as the jury determined that McKenzie was only 10% at fault and the trial judge, in granting the JNOV, did not reapportion fault between the parties, they should be held liable only for McKenzie's proportionate percentage of fault. In support of this contention, Farm Bureau and McKenzie rely on this court's prior opinion in Theriot v. Bergeron, 552 So.2d 1 (La. App. 1st Cir.1989).
In Theriot v. Bergeron, the trial court rendered judgment apportioning liability for passengers' damages between the drivers of the two other vehicles involved in an automobile accident at 80% and 20%, respectively. The court held all defendants solidarily liable to each of the passengers for the full amount of the damages. The passengers' uninsured motorist (UM) insurer filed a cross claim against the drivers and their insurers for indemnification and for the medical payments on the basis of conventional and legal subrogation. With regard to the cross claim, the trial court judgment was silent as to whether the two tortfeasors and their insurers were solidarily liable to the UM insurer.
On appeal, the majority of a panel of this court determined that the tortfeasors and their insurers were solidarily liable to the UM insurer, but that the UM insurer could recover from each tortfeasor only his proportionate share of the damages, namely 80% and 20% respectively.[12]
In the instant case, the accident occurred on July 12, 1986. At all times pertinent thereto, LSA-C.C. art. 2324 provided as follows:[13]

*806 He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido; provided, however, when the amount of recovery has been reduced in accordance with the preceding article [the comparative negligence article], a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed, reserving to all parties their respective rights of indemnity and contribution.
Clearly, LSA-C.C. art. 2324, prior to amendment in 1987, provided that, as a general rule, the entire amount of a judgment could be collected from any solidary obligor. Thus, any party determined to be at fault may be required to pay the entire amount of the judgment. Favorite v. Regional Transit Authority, 552 So.2d 487, 489 (La.App. 4th Cir.1989). The 1987 amendment to article 2324 changed the obligation from in solido to joint liability. Perez v. State, Department of Transportation and Development, 578 So.2d 1199, 1205 (La.App. 4th Cir.), writ denied, 581 So.2d 706 (La.1991). That amendment was a change in the substantive law and, therefore, should apply prospectively only and should not be applied retroactively. Perez v. State, Department of Transportation and Development, 578 So.2d at 1206; Favorite v. Regional Transit Authority, 552 So.2d at 489.
Recently, in Anderson v. New Orleans Public Service, Inc., 583 So.2d at 833, the Louisiana Supreme Court addressed this issue and determined that, prior to 1987, a defendant is answerable for all of the damages caused by the in solido tortfeasors. Therefore, our previous holding in Theriot v. Bergeron has been overruled impliedly by the Louisiana Supreme Court in Anderson v. New Orleans Public Service, Inc. to the extent that Theriot conflicts with Anderson.[14]
In the instant case, McKenzie was determined to be 10% at fault and the deceased driver of the host vehicle, Fussell, was determined to be 90% at fault for the injuries to Cindee Parker Wheat and Bruce L. Miley.[15] Because Farm Bureau and McKenzie are solidarily liable with Fussell for these damages, Wheat and Miley can collect the whole amount from either. See Anderson v. New Orleans Public Service, Inc., 583 So.2d at 833; Perez v. State, Department of Transportation and Development, 578 So.2d at 1206; Mitchell v. Clark Equipment Company, 561 So.2d 175, 180 (La.App. 5th Cir.1990); Llorence v. State, Department of Transportation and Development, 558 So.2d 320, 325 (La. App. 3rd Cir.), writs denied, 565 So.2d 442, 565 So.2d 443 (La.1990); Favorite v. Regional *807 Transit Authority, 552 So.2d at 489. Accordingly, we find that the trial court correctly determined that Farm Bureau and McKenzie are liable for the whole amount of the damage awards to Wheat and Miley.

DENIAL OF MOTION FOR NEW TRIAL
Miley, alternatively, contends that the trial court erred in failing to grant her a new trial. However, because of our disposition of the other issues in this appeal, we find it unnecessary to address this assignment of error.

CONCLUSION
For the above reasons, the judgment of the trial court with regard to the Miley case is amended to increase the award for the loss of the love and affection sustained by Eva Miley for the death of her son, Bruce L. Miley, from $35,000.00 to $100,000.00. In all other respects, the judgment of the trial court in the Miley case is affirmed.
With regard to the Wheat case, the judgment of the trial court is amended to increase the award for the loss of the love and affection sustained by Murphy Keith Wheat for the death of his wife, Cindee Parker Wheat, from $5,000.00 to $25,000.00. In all other respects, the judgment of the trial court in the Wheat case is affirmed.
Farm Bureau and McKenzie are cast for all costs on appeal.
AMENDED AND, AS AMENDED, AFFIRMED.
LANIER, J., concurs in part and dissents in part, and assigns reasons.
LeBLANC, J., concurs in part and dissents in part for reasons assigned by LANIER, J.
LANIER and LeBLANC, JJ., concurring in part and dissenting in part.
LANIER, Judge.
We agree with the majority holding that Cindee Parker Wheat was not an insured under the policy of insurance issued by Allstate. We dissent from the holding that the facts and inferences point so strongly and overwhelmingly in favor of the plaintiffs that reasonable men could only conclude that McKenzie's fault was a cause-in-fact of the accident. The majority's conclusion to the contrary is wrong as a matter of fact and law.
The accident in this case occurred at the intersection of Seven Mile Road and Louisiana Highway 10 (La. 10) in Washington Parish, Louisiana. La. 10 is the favored roadway; the intersection of Seven Mile Road with La. 10 is controlled by a stop sign.

The Fault of Fussell
To properly evaluate the fault of McKenzie and its causal nexus with the accident, we also must examine the fault of Fussell. McLaughlin v. Fireman's Fund Insurance Company, 533 So.2d 340 (La.1988). The majority correctly observes that "The Fussell vehicle was proceeding south on Seven Mile Road" and that "As the Fussell vehicle attempted to turn left onto Louisiana Highway 10, it was struck by the McKenzie vehicle." Fussell's passage from Seven Mile Road to La. 10 was controlled by a stop sign. There is no direct evidence in the record to show whether Fussell ran the stop sign or stopped and thereafter failed to yield the right-of-way to the McKenzie vehicle. In either event, Fussell was at fault for entering into the intersection right in front of the McKenzie vehicle.
After the accident, a blood sample was drawn from Fussell's body and sent to the Thomas F. Puckett Laboratory for analysis. At the trial, Patricia Bailey, the supervisor of gas chromatography for the laboratory, testified that she tested Fussell's blood and found it had a blood-alcohol content of 0.20 percent.
Fussell's fault is composed of three elements: (1) failing to yield the right-of-way; (2) driving while intoxicated; and (3) attempting a left turn across a major highway without ascertaining in advance that the way was clear and the turn could be made safely.

*808 Causal Nexus Between the Fault of McKenzie and the Accident

The jury rendered verdicts which factually determined that McKenzie was negligent and his negligence was not a cause-in-fact of the accident. By granting the JNOV and holding that McKenzie's negligence was a cause-in-fact of the accident, the trial court ruled that the facts and inferences pointed so strongly and overwhelmingly in favor of the plaintiffs that reasonable men could not arrive at a contrary verdict. The majority affirms this ruling. This ruling either ignores the testimony of Duaine T. Evans or it considers Evans' testimony and rejects it as not being credible. If the ruling ignores Evans' testimony, it is factually wrong because, as pointed out by the majority opinion, "A JNOV may be granted only when the evidence, viewed in the light most favorable to the party opposing the motion [McKenzie], points so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict on the facts at issue." (Emphasis added). If the ruling determined that Evans' testimony was not credible, it is legally wrong because, as pointed out by the majority opinion, when ruling on a motion for JNOV "... the trial court may not weigh the evidence, pass on the credibility of the witnesses, or substitute its reasonable inferences from the facts for those of the jury." (Emphasis added). In Barnes v. Thames, 578 So.2d 1155, 1169 (La.App. 1st Cir.), writ denied, 577 So.2d 1009 (La.1991), this court sitting en banc, specifically held that in ruling on a motion for JNOV "... the court cannot weigh the evidence, pass on the credibility of the witnesses, or substitute its judgment of the facts for that of the jury."
Duaine T. Evans was called as a witness on behalf of McKenzie and his insurer, Farm Bureau. He was qualified as an expert witness in the fields of traffic engineering and accident reconstruction. He was the only witness so qualified to testify at the trial. Evans testified in great detail about the facts and methods he used to make his calculations and formulate his opinions. Evans testified that the roadway of La. 10 at the scene of the accident was designed for a 55 mile-per-hour (mph) running speed. After considering all of the various pertinent facts, such as the direction of travel of the vehicles before and after the accident, the weight of the vehicles and the coefficient of friction of the roadway, Evans was of the opinion that (1) Fussell's vehicle entered the intersection at "a relatively low speed", (2) Fussell's vehicle was going 26 mph in a westerly direction immediately after impact, (3) McKenzie's vehicle was traveling between 52 and 55 mph when he applied his brakes and started to skid, (4) McKenzie's vehicle was going 50 mph immediately prior to its impact with the Fussell vehicle, and (5) McKenzie's vehicle was going 26 mph when it separated from the Fussell vehicle after impact. Evans testified that in his opinion, McKenzie was faced with a sudden emergency and had approximately three seconds to react and stop when the Fussell vehicle entered the roadway of La. 10 in front of him. Ultimately, Evans gave the following testimony concerning the cause-in-fact issue:
THE WITNESS: I believe the Fussell vehicle came out into the roadway in front of the McKenzie vehicle. The McKenzie driver appeared to take evasive action in steering and braking. The McKenzie vehicle impacted the Fussell vehicle broadside approximately at the center line of the highway.
. . . . .
Q. How would you describe the way it happened based upon your investigation?
A. I think it occurred in a very rapid manner. It was a very short period of time. Everything, reaction, skidding, impact, it was over within seconds.
Q. In your expert opinion, do you think it would have made any difference if the McKenzie vehicle was going forty-five miles per hour?
A. I believe the impact would still have occurred. It may not have hit the Pontiac in the center. It may have hit it near the rear.

*809 Q. The accident still would have happened?
A. It still would have happened.
The jury apparently accepted Evans' testimony as credible when it reached its verdict that McKenzie's negligence was not a cause in fact of the accident.
To put what the majority has done in perspective, let us hypothesize that we are reviewing the jury's factual finding in a regular appeal, instead of pursuant to an appeal of a ruling on a motion for a JNOV. In this procedural posture, the manifest error or clearly wrong standard of appellate review applies. Because Evans was an expert witness, the following law found in Lirette v. State Farm Insurance Company, 563 So.2d 850, 852-853 (La.1990) is applicable:
It is well settled that a court of appeal may not set aside a finding of fact by a trial court or a jury in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
. . . . .
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
. . . . .

The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. (Emphasis added; citations omitted)
When making a manifest error (clearly wrong) fact review, an appellate court is not required to consider the three evidentiary elements of weight, credibility and inferences in the light most favorable to the prevailing party; the court only must accept reasonable evaluations of credibility and reasonable inferences and may determine if the overall weight of the evidence is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); State in the Interest of Cox, 461 So.2d 658 (La.App. 1st Cir.1984), writ denied, 464 So.2d 1375 (La. 1985). However, as previously indicated, when reviewing a jury fact determination pursuant to a motion for a JNOV, a court must view the evidence in the light most favorable to the party opposing the motion and it can not weigh the evidence, pass on the credibility of the witnesses, or substitute its reasonable inferences for those of the jury.
In the instant case, if we review the record, and the testimony of Evans in particular, pursuant to the rules set forth in Lirette, we can not say that the reasons given by Evans are patently unsound. When Evans' testimony is viewed in the light most favorable to McKenzie, it is obvious that the majority has committed factual and legal error.
The instant case is very similar to the case of Lang v. Cage, 554 So.2d 1312 (La. App. 1st Cir.1989), writ denied, 558 So.2d 605 (La.1990). In that case, Cage was driving a vehicle in a southerly direction on La. 1 in West Baton Rouge Parish. Lang and another person were passengers in the vehicle. At the same time and place an 18-wheeler tractor-trailer owned by Yellow Freight System, Inc. (Yellow Freight) was traveling in a northerly direction. The Cage vehicle stopped in the roadway and then made a left turn in front of the truck. The truck hit the Cage vehicle "dead center". The Cage vehicle caught fire and the three people in it burned to death. The trial court found as a fact that the driver of the truck was speeding "by as much as six to eight mph" and was 30% at fault. On appeal, this court reversed the trial court finding of liability against Yellow Freight with the following rationale:
Thus, conceding the fact that the truck was slightly exceeding the speed limit, was such conduct a cause in fact of the collision? The cause in fact test requires *810 that but for the defendant's conduct, the injuries would not have been sustained. Technically, had Mr. Shoemaker not been travelling several miles over the speed limit he would not have been at the exact location at the exact moment the collision occurred. We find no manifest error in the trial court's ruling that Shoemaker's speed was, in the technical sense, a "but for" cause of the accident.
Next, did Mr. Shoemaker owe a duty to protect these plaintiffs from the type of harm involved, arising in the manner in which the accident occurred? We conclude that he did not. As a driver, Shoemaker had a duty to use reasonable care in the operation and control of his vehicle so as not to create an unreasonable risk of harm with regard to other motorists. This duty encompassed within its scope the risk that a collision might occur and guest passengers might be injured. However, we decline to find that said duty extends to or was intended to protect against injuries arising in the manner in which they did in this case.
The jurisprudence of this state is well settled that a motorist who attempts to make a left turn from a public highway is required to ascertain in advance that the way is clear and that the turn can be made safely and without endangering oncoming or overtaking vehicles and he must yield the right of way to such vehicles. The failure of a left turning motorist to make such a determination and to exercise the required degree of caution before undertaking to make such a turn constitutes negligence.... Consequently, a motorist travelling on a high-speed, multilane highway is not required to anticipate that a motorist entering the highway will not yield the right of way. Such motorist can indulge in the assumption that the other driver will observe the law and yield the right of way until he sees, or should see, that the other car has not observed, or is not going to observe, the law....

After thoroughly reviewing the entire record, we find it reflects that the accident and the consequent injuries resulted solely from the negligent conduct of Freddie Cage, namely, his exercise of poor judgment due to his intoxicated state in suddenly and unexpectedly pulling out directly in front of Mr. Shoemaker, who had no control over the matter. The record does not indicate that Shoemaker failed to do anything he should have done which would have prevented the accident once he was or should have been aware of the impending danger. In fact, the record shows that when Shoemaker observed the Cage vehicle turn left into the neutral ground he applied his brakes and downshifted. Only when he saw the car stop did he release his brakes, relying on the act of stopping as indicating that Cage was going to yield the right of way. By the time Shoemaker knew or should have known that Cage was not going to respect his right of way, it was too late for him to take any evasive action, regardless of his speed.

We conclude that the trial court erred as a matter of law in finding that Shoemaker owed a duty to protect these plaintiffs from the harm incurred arising in the manner in which the accident took place. This court finds that although Shoemaker may have slightly exceeded the speed limit, his speed was not excessive. The superseding, intervening act of Freddie Cage in entering the highway without yielding the right of way amounts to gross negligence which places plaintiffs outside the scope of Shoemaker's duty and relieves defendants of any liability.

(Emphasis added; citations omitted)

Lang v. Cage, 554 So.2d at 1316-1317.
In the instant case, Evans testified that the accident would have occurred whether McKenzie was traveling at a legal speed (45 mph) or at a higher speed. The jury accepted this testimony. This factual determination was not manifestly erroneous (clearly wrong), and certainly was not wrong when viewed in the light most favorable to McKenzie. The sole cause-in-fact and the legal cause of the accident herein was the gross negligence of Fussell.
*811 For the foregoing reasons we dissent in part.
LANIER and LeBLANC, JJ., dissenting from the denial of the rehearing.
LANIER, Judge.
A rehearing should be granted in this case because the result reached by this court in the case of Magee v. Coats, 598 So.2d 531 (La.App. 1st Cir.1992) (decided April 10, 1992, under docket number CA-91-0345-6) is in conflict with the result reached by the majority in the instant case.
The facts in the instant case are remarkably similar to those in the Magee case. Both cases (1) come from the Bogalusa area, (2) involve an intersectional collision where entrance to the intersection is controlled by a stop sign, (3) have a speeding driver on the favored street, (4) have the driver on the inferior street failing to yield at the stop sign, and (5) have a jury special verdict that the fault of the driver on the favored street was not a cause of the accident.
In holding that the jury verdict was not clearly wrong, the Magee court observed, in pertinent part, as follows at 598 So.2d at 537:
The jury was clearly entitled to find that plaintiffs failed to meet their burden of proof for "legal cause." Wells testified that the accident would not have happenedthe definition of the "but for" testif either Magee had yielded the right of way or if Coats had been driving the speed limit. Burkhart testified that, assuming thirty-four feet of skidmarks, there would have been no collision; at twenty-four feet, there would have been a minimal collision. Griffith testified that the difference in reaction time between a vehicle traveling thirty-five miles per hour and forty-two miles per hour would have been one-half second. Coats testified he had no time to stop; as soon as he applied his brakes, the two vehicles collided.
Given conflicting and inconclusive evidence on whether the accident would have happened absent Coats' alleged speeding, and given the uncontradicted evidence concerning Magee's failure to yield the right of way and his entry into the intersection at a speed of fifteen to twenty miles per hour, the jury's findings are not clearly wrong. It was entitled to find that Coats' conduct was not a "substantial factor" in bringing about the accident where the accident may have happened absent his speeding, and where other factors contributed to the accident.
Coat's negligence, even if it is conceded to be a cause-in-fact of the accident, is not necessarily a legal cause unless the second part of the Dixie Drive It Yourself inquiry is met: should a defendant be relieved of liability because of the intervening negligence of another? Under a duty-risk analysis, was the risk of Magee's death the harm protected against by the imposition of the thirty-five mile per hour speed limit? Yes; but it was also the harm sought to be avoided by the imposition of the rule that left-turning motorist must yield to oncoming traffic on favored roadways, and remain stopped at intersectional stop signs until it is safe to proceed. Confronted with evidence of several causes of the accident which led to Magee's death, the jury found that Coats' negligence was not a legal cause of the accident. We will not disturb that finding.
The major distinction between the instant case and Magee is that in Magee the driver on the inferior street only failed to yield the right-of-way, whereas, in the instant case, the driver on the inferior street failed to yield the right-of-way, was driving while intoxicated with a BA level of 0.20 percent, and was attempting a left turn.
We believe that equal justice under the law requires that the results in the instant case and Magee be the same.
NOTES
[1] Bruce L. Miley and Robert R. Fussell were killed instantly in the automobile accident. Cindee Parker Wheat was transported to the hospital for treatment where she died approximately seven hours later.
[2] Robert Fussell's parents were dismissed pursuant to an exception pleading the objection of no cause of action.
[3] Nadine Rogers died prior to the disposition of Miley's claims against her. Thereafter, on joint motion, Miley compromised and settled her claims against James Rogers and the estate of Nadine Rogers, dismissing her claims against them with prejudice.
[4] The issue of exemplary damages was severed from the other claims, and the trial of this matter did not involve the claim for exemplary damages.
[5] Allstate filed a motion for summary judgment on the issue of coverage on the grounds that Cindee Parker Wheat and her husband, Murphy Keith Wheat, were physically separated on the date of the accident. Allstate reasoned that, because Cindee Parker Wheat was not a resident of her husband's household at the time of the accident, she was not covered by the Allstate policy. By judgment, dated August 7, 1987, the trial court denied Allstate's motion for summary judgment.
[6] Prior to the disposition of Wheat's claims against her, Nadine Rogers died. Wheat also compromised and settled his claims against James Rogers and the estate of Nadine Rogers, dismissing his claims against them with prejudice.
[7] The jury deliberated three times because of the apparent inconsistencies with their verdicts. The following represents the special verdict rendered by the jury on each of those occasions: (The first column represents the jury's responses after its first deliberation, the second column represents the jury's responses after its second deliberation, and the third column represents the jury's responses after its third and final deliberation).

1. Do you find that Ben McKenzie was negligent?
 No. Yes. Yes.
2. If the answer to the above interrogatory is yes, do you find that Ben McKenzie's conduct was a cause-in-fact of the accident and injuries sustained by Cindee Parker Wheat, Robert Fussell, and Bruce Miley.? [sic]
No Answer. No Answer. No.
3. Do you find that Robert Fussell was negligent?
Yes. Yes. Yes.
4. If the answer to interrogatory number three was yes, do you find that Robert Fussell's conduct was a cause-in-fact of his own injuries and those of Cindee Parker Wheat and Bruce Miley?
Yes. Yes. Yes.
IF YOU ANSWERED `YES' TO ANY OF THE FOREGOING QUESTIONS, ANSWER THE FOLLOWING QUESTIONS IN ACCORDANCE WITH THOSE ANSWERS. IF YOU ANSWERED `NO' TO ALL OF FOUR OF THE FOREGOING QUESTIONS, SIGN AND DATE THIS SPECIAL VERDICT FORM AND RETURN TO THE COURT ROOM TO REPORT YOUR FINDINGS.
WITH REGARD TO THE CASE CONCERNING THE DEATH OF CINDEE PARKER WHEAT, ANSWER THE FOLLOWING QUESTIONS.
5. Does the Allstate policy issued to Murphy Keith Wheat provide coverage for the injuries and death of his wife, Cindee Parker Wheat?
No. No. No.
6. Was Cindee Wheat comparatively negligent?
Yes. Yes. Yes.
7. If the answer to interrogatory number six was `yes', was her conduct a cause-in-fact of her injuries?
Yes. Yes. Yes.
8. Assign the percentage of fault, if any, to each of the following parties. If you assign no fault to a particular party, place a zero on the line opposite that party's name. Your answer must total 100% or 0%

Ben McKenzie 10% 10% 10%
Robert Fussell 90% 90% 85%
Cindee Parker Wheat 0% 0% 5%
TOTAL 100% 100% 100%

9. If you have assigned any percentage of fault to either Ben McKenzie or Robert Fussell, what damages, if any, do you find that Murphy Keith Wheat has sustained as a result of his wife's death?
Loss of love and affection $ -0- $ -0- $ -0-
Conscious pain and suffering of Cindee Parker Wheat $ -0- $ -0- $ -0-
Medical expenses $7,150 $7,150 $7,150
TOTAL $7,150 $7,150 $7,150
(If you determine that monetary damages, if any, are due to any plaintiff in these cases, you are to award the total amount you believe is due to each. You are not to reduce an award by any percentages you may have found attributable to the conduct of any plaintiff. The Court has the duty to apportion the damages according to any percentages you have determined.)
WITH REGARD TO THE CASE CONCERNING THE DEATH OF ROBERT FUSSELL, ANSWER THE FOLLOWING QUESTIONS.
10. Assign the percentage of fault, if any, to each of the following parties. If you assign no fault to a particular party, place a zero on the line opposite that party's name. Your answer must total 100% or 0%
Ben McKenzie 10% 10% 10%
Robert Fussell 90% 90% 90%
TOTAL 100% 100% 100%
11. If you have assigned any percentage of fault to Ben McKenzie, what damages, if any, do you find that John and Elta Fussell sustained as a result of Robert Fussell's death?

Conscious pain and suffering of Robert Fussell $ -0- $ -0- $ -0-
Burial and funeral expenses $ -0- $ -0- $ -0-
Loss of love and affection of John Fussell $ -0- $ -0- $ -0-
Loss of love and affection of Elta Fussell $ -0- $ -0- $ -0-
TOTAL $ -0- $ -0- $ -0-

(If you determine that monetary damages, if any, are due to any plaintiff in these cases, you are to award the total amount you believe is due to each. You are not to reduce an award by any percentage you may have found attributable to the conduct of any plaintiff. The Court has the duty to apportion the damages according to any percentages you have determined.)
IN REGARD TO THE CASE CONCERNING THE DEATH OF BRUCE MILEY, ANSWER THE FOLLOWING QUESTIONS.
12. Was Bruce Miley comparatively negligent?
 Yes. Yes. Yes.
13. If the answer to interrogatory number twelve was `yes', was his conduct a cause-in-fact of his injuries?
 Yes. Yes. Yes.
14. Assign the percentage of fault, if any, to each of the following parties. If you assign no fault to a particular party, place a zero on the line opposite that party's name. Your answer must total 100% or 0%

Ben McKenzie 10% 10% 10%
Robert Fussell 90% 90% 85%
Bruce Miley 0% 0% 5%
TOTAL 100% 100% 100%

15. If you have assigned any percentage of fault to Ben McKenzie or Robert Fussell, what damages, if any, do you find that Eva Miley sustained on her own behalf and on behalf of her deceased son, Bruce Miley?

Loss of love and affection of Bruce Miley $ -0- $ -0- $ -0-
Conscious pain and suffering of Bruce Miley $ -0- $ -0- $ -0-
Burial and funeral expenses $ -0- $ -0- $ -0-
TOTAL $ -0- $ -0- $ -0-

(If you determine that monetary damages, if any, are due to any plaintiff in these cases, you are to award the total amount you believe is due to each. You are not to reduce an award by any percentages you may have found attributable to the conduct of any plaintiff. The Court has the duty to apportion the damages according to any percentages you have determined.)
[8] Neither the Fussells nor Farm Bureau and McKenzie appealed the trial court judgment in the Fussell case. Therefore, this judgment is not before us on appeal.
[9] On appeal, Farm Bureau and McKenzie do not allege that the trial judge's disturbance of the jury's assessment of damages and his award of $35,000.00 to Eva Miley for the loss of the love and affection of her deceased son was error. Rather, Farm Bureau and McKenzie argue that the trial court erred in disturbing the jury's assessment of damages with regard to Wheat was error. Therefore, the issue of whether the trial court erred in disturbing the jury's assessment of damages with regard to the Miley case is not before us on appeal.
[10] At this point, counsel for Wheat, Miley, and Fussell moved for a mistrial and/or a new trial, which was denied by the trial judge.
[11] At this point, counsel for Wheat, Miley, and Fussell again moved for a mistrial and/or a new trial.
[12] In Theriot v. Bergeron, 552 So.2d 1 (La.App. 1st Cir.1989), the writer of this opinion, dissented in part. In this dissent, I noted that, at all times pertinent to the facts in Theriot v. Bergeron, the law clearly provided that the entirety of a solidary obligation could be collected from either of the solidary obligors. For this reason, the dissent questioned that portion of the majority opinion holding that plaintiffs' subrogee could collect only 20% of his damages from a solidary obligor because plaintiff could recover no more than 20% of his damages from such solidary obligor. The Louisiana Supreme Court has impliedly approved the rationale of this dissent in Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991).
[13] By Acts 1987, No. 373, Section 1, effective September 1, 1987, LSA-C.C. article 2324 was amended to provide as follows:

A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of this Article, all parties shall enjoy their respective rights of indemnity and contribution. Except as described in Paragraph A of this Article, or as otherwise provided by law, and hereinabove, the liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, or immunity by statute or otherwise.
This provision was again modified by Acts 1988, No. 430, Section 1, to enact the following provision:
C. Interruption of prescription against one joint tortfeasor, whether the obligation is considered joint and divisible or solidary, is effective against all joint tortfeasors. Nothing in this Subsection shall be construed to affect in any manner the application of the provisions of R.S. 40:1299.41(G).
[14] In Anderson v. New Orleans Public Service, Inc., 583 So.2d at 833, the supreme court stated:

This accident occurred prior to the 1987 revision of LSA-C.C. Art. 2324, which deals with the liability of solidary obligors. Art. 2324, at the time of this accident, provided:
`He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
`Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido; provided, however, when the amount of recovery has been reduced in accordance with the preceding article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed, reserving to all parties their respective rights of indemnity and contribution.'
Therefore, if any negligence on Ms. Bailey's part was a cause of the accident, the NOPSI is liable in solido with her, and as a result, is answerable for all of the damages caused by the in solido tortfeasors to the plaintiff, provided that plaintiff is not attributed with a greater degree of fault than is NOPSI. [emphasis added].
[15] After granting the JNOV, the trial judge did not reduce the award to plaintiffs by the percentage of fault attributed by the jury to Cindee Parker Wheat and Bruce L. Miley, respectively. However, the issue of whether the trial judge should have reduced the quantum awards to Wheat and Miley by the percentages of fault attributed to Cindee Parker Wheat and Bruce L. Miley was not raised by the parties on appeal. Therefore, this issue is not properly before us.